USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/21/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------- X

AMBRIZ TRADING CORPORATION
and ILYA LOBANOV,

                Plaintiffs,

    - against -

URALSIB FINANCIAL
CORPORATION, URALSIB
SECURITIES LIMITED, URALSIB
CAPITAL, LLC and MALBOURNE
INVEST & FINANCE, S.A.,

                Defendants.

---------------------------------------------- X

**OPINION AND ORDER**

**11 Civ. 4420 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Ambriz Trading Corporation ("Ambriz") and Ilya Lobanov

(collectively the "plaintiffs") bring this action against OJSC Financial Corporation

URALSIB ("UFC"), URALSIB Capital, LLC ("UC"), URALSIB Securies Limited

("USL"), and Malbourne Invest & Finance, S.A. ("Malbourne") (collectively the

"defendants") alleging (1) that defendants participated in a criminal enterprise

under the Racketeer Influenced and Corrupt Organizations ("RICO") laws,[1] (2) that

---

    [1]     *See* 18 U.S.C. §§ 1962(c)-(d), 1964(c).

1

defendants engaged in securities fraud in violation of the Securities Exchange Act of 1934 ("SEA"),[2] and (3) unjust enrichment.[3]   Defendants now move to dismiss the Complaint on the grounds that (1) plaintiffs have not made a reasonable effort to effectuate service of process;[4] (2) lack of personal jurisdiction;[5] (3) all claims against Malbourne must be arbitrated; (4) venue is improper under the doctrine of forum non conveniens; and (5) plaintiffs have failed to state a claim.[6]   Because plaintiffs have failed to effectuate service of process, defendants' motion is granted.

## II.   BACKGROUND

### A.   The Parties

Ambriz is a corporation under the laws of Seychelles with its principal place of business in Moscow, Russia.[7]   Ambriz was a client of Malbourne from 2005 to 2009, during which time Malbourne arranged for the execution of equity

---

[2]   See 15 U.S.C. § 78a et seq.

[3]   Plaintiffs' remaining claims for breach of contract have been voluntarily withdrawn, see Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 2 n.4.

[4]   See Fed. R. Civ. P. 12(b)(5).

[5]   See id. 12(b)(2).

[6]   See id. 12(b)(6).

[7]   See Complaint ("Compl.") ¶ 9.

trades on Ambriz's account.[8]  Lobanov is a citizen of Russia who resides in

Moscow.[9]  Lobanov was employed as the Relationship Manager by UC in Moscow

from May 2001 through September 2009.[10]  While there, his responsibilities

included managing client securities accounts, developing client relationships and

generating new trading business.[11]  The terms of Lobanov's employment at UC

were governed by a contract written in Russian and governed by Russian law.[12]

Lobanov ceased working for UC in September 2009.[13]

UFC is an open joint stock company under Russian law.[14]  UFC

operates exclusively as a holding company and has only one office, in Moscow,

---

[8]      See 9/21/11 Declaration of Georgia Georgiou, Director of Malbourne, ("Georgiou Decl.") ¶ 7.

[9]      See Compl. ¶ 10.

[10]     See 9/21/11 Declaration of Mark A. Temkin, Chief Executive Officer and General Director of UC, ("Temkin Decl.") ¶¶ 9-10.

[11]     See id.

[12]     See id.; see also 1/1/02 Employment Agreement No. 1979, Exs. 1 and 2 to Temkin Decl. (with translation).

[13]     According to defendants, Lobanov resigned after UC discovered that he had violated company policies.  See Temkin Decl. ¶ 13.  According to plaintiffs, Lobanov was fired in retaliation for exposing an illegal company scheme.  See Pl. Mem. at 1 n.1.

[14]     See 9/21/11 Declaration of Lyudmila A. Shabalkina, Deputy Chief Executive Officer and General Director of UFC, ("Shabalkina Decl") ¶ 2.

Russia, where all twenty of its employees work.[15]  UFC is the parent company of a number of subsidiaries, and neither it nor its subsidiaries maintain or have ever maintained any offices, bank accounts, real estate or phone listings in New York.[16]

UC is a limited liability company under Russian law.[17]  UC is a subsidiary of UFC and operates as a licensed broker-dealer and investment banking company.[18]  Its operations are regulated by the Russian Federal Service on Financial Markets — the Russian equivalent of the U.S. Securities and Exchange Commission ("SEC").[19]  UC executes trades on the Russian Trading System Stock Exchange ("RTS") and the Moscow Interbank Currency Exchange Stock Exchange ("MICEX").[20]  UC has no offices outside of Russia and all of its two hundred employees work in Moscow.[21]  UC does not have any bank accounts, offices, real estate or phone listings in New York, and it is not authorized to execute trades on

---

[15]     *See id.* ¶ 4.

[16]     *See id.* ¶¶ 3, 5; *see also* Supplemental Declaration of John Lewin, Managing Director of USL, ("Lewin. Supp. Decl.) ¶ 2.

[17]     *See* Temkin Decl. ¶ 2.

[18]     *See id.*

[19]     *See id.*

[20]     *See id.* ¶ 3.

[21]     *See id.* ¶ 4.

4

the New York Stock Exchange ("NYSE").[22]  UC's revenue is derived exclusively

from customers outside of the United States.[23]  While Ambriz was a client of

Malbourne, Ambriz's accounts were managed by UC employees and all the

relevant documentation regarding trades executed on behalf of Amrbiz is housed at

UC's Moscow office.[24]

USL is a private limited company under English law.[25]  USL is a

subsidiary of UFC and operates as a broker-dealer regulated by the United

Kingdom's Financial Services Authority and as a member of the London Stock

Exchange ("LSE").[26]  All fourteen of USL's employees work in its only office in

London.[27]  USL serves institutional investors in Europe who wish to invest in

Russian companies listed on the LSE.[28]  USL does not have any offices, real estate

or phone listings in New York and is not authorized to trade on the NYSE.[29]  USL

---

[22]  *See id.* ¶¶ 5-6.

[23]  *See id.* ¶ 7.

[24]  *See id.* ¶ 11.

[25]  *See* 9/21/11 Declaration of John Lewin ("Lewin Decl.") ¶ 6.

[26]  *See id.*

[27]  *See id.* ¶ 3.

[28]  *See id.* ¶ 4.

[29]  *See id.* ¶¶ 3-4.

maintains a special purpose bank account with JP Morgan Chase in New York.[30]

This account exists to help clients who choose to settle trades on the MICEX in

U.S. dollars through a clearing mechanism offered by the Russian Depositary

Clearing Company ("RDCC").[31]  The balance of this account is swept out to USL's

foreign bank accounts or to clients' accounts at the end of each day after the trades

are settled as required by the RDCC.[32]

Malbourne is a company under the laws of Anguilla with a registered

address in Anguilla in the British Virgin Islands.[33]  Malbourne is a subsidiary of

UFC with no employees and with all of its operations handled by UC employees in

Moscow and USL employees in London.[34]  Malbourne executes trades on behalf of

clients through Anguilla in order to take advantage of the country's favorable tax

policies.[35]  Because Malbourne has no employees, though, all the actual trading

takes place in Moscow and London.[36]  For example, while Ambriz was a client, all

---

[30]     *See id.* ¶ 5.

[31]     *See id.*

[32]     *See id.*

[33]     *See* Georgiou Decl. ¶ 2.

[34]     *See id.* ¶ 3.

[35]     *See id.* ¶ 2.

[36]     *See id.* ¶ 3.

of Ambriz's accounts were managed from UC's Moscow office and all the trading

records are maintained there.[37]   Malbourne has no offices, real estate or phone

listings in New York.[38]   Like USL, Malbourne maintains a bank account at JP

Morgan Chase in New York for the purpose of settling trades for clients who

choose to use U.S. dollars to settle their trades.[39]

Defendants are affiliated with two other entities, Jefferies

International Limited ("Jefferies") and Auerbach Grayson & Company

("Auerbach").   Jefferies is a London based broker-dealer with affiliates in New

York.[40]   Because none of defendants are authorized to execute trades on the NYSE,

when a client wishes to execute a trade on the NYSE, defendants refer the order to

Jefferies.[41]   Jefferies is then able to execute the trade in the United States through

its New York affiliate which is authorized to trade on the NYSE.[42]   For example,

when Ambriz wanted to execute trades on the NYSE, those trades were referred to

---

[37]     *See id.* ¶ 8.

[38]     *See id.* ¶ 4.

[39]     *See id.* ¶ 5.

[40]     *See* Lewin Decl. ¶ 7.

[41]     *See id.*

[42]     *See id.*

Jefferies.[43]

Auerbach is a New York based broker-dealer registered with the SEC.[44]  UC and USL have a correspondent brokerage relationship with Auerbach since 1999 pursuant to Rule 15a-6 under the SEA whereby UC and USL can market their services — investment opportunities in Russian companies on the RTS, MICEX and LSE — to certain sophisticated, qualified U.S. institutional investors without having to register with the SEC.[45]  Auerbach provides these investors with access to the Russian stock market through UC and USL and, in return, Auerbach and UC or USL split the commissions on these trades.[46]  Such commissions comprise between one and two percent of UC and USL's annual revenue.[47]  Since 2007, Auerbach has employed two or three salespersons in the United States covering the Russian markets who share research and analysis of the Russian markets with American investors to increase their interest in Russian

---

[43]     *See id.*

[44]     *See id.* ¶ 9.

[45]     *See id.* ¶¶ 9-10.  Defendants' relationships with Auerbach are governed by contract.  *See* Auerbach Grayson Agreements, Exs. 1, 2 and 3 to Lewin Decl.

[46]     *See* Lewin Decl. ¶ 14.

[47]     *See id.* ¶ 15.

investments.[48]  USL reimburses Auerbach for the salaries as well as expenses of these employees.[49]  The allegations in the Complaint are not related to USL's relationship with Auerbach.[50]

**B.    The Parties' Course of Dealing**

Ambriz was a client of Malbourne from approximately 2005 through 2009.[51]  Because Malbourne has no employees, all of the trading on Ambriz's behalf was done by employees of UC and USL and all the information and documentation relating to Ambriz's account was stored at UC's office in Moscow.[52]  During this time, Ambriz and Malbourne's relationship was governed by a series of five contracts.[53]  Among other things, these contracts provided that "[a]ny dispute, controversy or claim arising out of or in connection with the Agreement . . . shall be finally settled by arbitration in accordance with the Rules

---

[48]    *See id.* ¶ 16.

[49]    *See id.*

[50]    *See id.* ¶ 17.

[51]    *See* Georgiou Decl. ¶ 7.

[52]    *See id.* ¶ 8.

[53]    *See id.*; *see also* Malbourne-Ambriz Contracts, Exs. 1-5 to Georgiou Decl.

of the Arbitration Institute of the Stockholm Chamber of Commerce."[54]

While Ambriz was a client, 1,622 trades were executed on its account by UC and USL.[55]  Of those trades, 1,221 were executed on Russian stock exchanges (or 75.3%), 349 were executed on the LSE (or 21.5%), and 52 were executed on the NYSE (or 3.2%).[56]  The 52 NYSE trades were executed by Jefferies in New York.[57]

Ambriz and Malbourne's relationship ended in 2009 at around the same time as Lobanov's departure from UC.[58]  On March 16, 2010, a dispute arose concerning Malbourne's refusal to execute Ambriz's request to transfer its funds held by defendants to Ambriz's account at Credit Suisse, and Ambriz initiated arbitration.[59]  On August 19, 2010, Malbourne voluntarily released the funds, and on December 15, 2010, the arbitration panel in Sweden found in favor of Ambriz, and awarded Ambriz damages and fees.[60]  The arbitration did not involve any

---

[54]    12/1/04 Malbourne-Ambriz Contract, Ex. 1 to Georgiou Decl., ¶ 26.

[55]    *See* Lewin Decl. ¶ 6.

[56]    *See id.*

[57]    *See id.* ¶ 7.

[58]    *See id.* ¶ 8.

[59]    *See id.*; *see also* Compl. ¶¶ 31-32.

[60]    *See* Compl. ¶¶ 33-34.

allegations of trading improprieties.[61]  On March 8, 2011, Ambriz filed a petition

with this Court to confirm the arbitral award.[62]  On March 14, 2011, Ambriz

voluntarily dismissed the action and the Court vacated its earlier temporary

restraining order freezing Malbourne's assets in its JP Morgan Chase bank

account.[63]

###    C.    The Present Action

###        1.    RICO and Securities Fraud

Despite the successful arbitration, Ambriz alleges that it has not been

made whole because in addition to refusing to transfer Ambriz's accounts,

defendants have systematically and continuously engaged in fraud and corrupt

practices during the time that defendants were executing trades on Ambriz's

account.[64]  Specifically, plaintiffs allege that UFC and its subsidiaries were

"engaged in a scheme, pursuant to which purchases and sales of stock were made

at one time in the day upon which they were ordered, but recorded and reported as

---

[61]        *See* Lewin Decl. ¶ 8.

[62]        *See* Pl. Mem. at 3; *Ambriz Trading Corp. v. Malbourne Inv. & Fin., S.A.*, No. 11 Civ. 1567 (DAB)  (S.D.N.Y. 2011).

[63]        *See* 3/8/11 Order to Show Cause (No. 11 Civ. 1567, Dkt. No. 5), Ex. A to Declaration of Tedd Kessler, plaintiffs' counsel, ("Kessler Decl."); 3/14/11 Notice of Voluntary Dismissal (No. 11 Civ. 1567, Dkt. No. 6).

[64]        *See* Compl. ¶ 36.

having been made at another time that same day."[65]  Through this scheme,

defendants were able to (1) record purchases as having occurred when the purchase

price was higher than at the actual time of execution, and thereby pocket the

difference between the lower, actual price and the higher, purported purchase

price; and (2) record sales as having occurred when the sale price was lower than at

the actual time of execution, and thereby pocket the difference between the higher,

actual sale price and the lower, purported sale price.[66]  Through this scheme,

Ambriz alleges that it was defrauded of at least three million dollars.[67]  Thus, under

the treble damages provision of the RICO laws, Ambriz claims that it is entitled to

at least nine million dollars.[68]

Plaintiffs further allege that this action must be brought in the United

States, and not in Russia, for a number of reasons: (1) Russian law does not

provide for treble damages; (2) Russian law has no equivalent of RICO violations;

(3) Russian courts would lack jurisdiction (referred to as "competence") in this

matter to the extent that it involved injuries arising out of conduct occurring

---

[65]     *Id.* ¶ 19.

[66]     *See id.* ¶¶ 20-22.

[67]     *See id.* ¶ 23.

[68]     *See id.* ¶ 79.

outside of Russia; and (4) because of the difficulties in combining criminal and civil actions in Russian courts.[69]  Defendants strongly resist this conclusion and contend that: (1) Russian law recognizes the general types and natures of claims asserted here; (2) Russian courts would have jurisdiction to entertain the claims asserted here; (3) Russian civil and procedural law can accommodate the kind of complex multi-party litigation brought here; and (4) it would be exceedingly difficult under international law to obtain proper discovery and travel visas that would be necessary to litigate this matter in the U.S.[70]  Defendants further argue that "[w]hile Russia does not allow for punitive or treble damages and does not have a RICO statute . . . Russian law provides for causes of action for the kinds of claims and wrongs alleged by plaintiffs in this case."[71]  Moreover, all defendants state that they are amenable to suit in Russia and would consent to service in Russia as well as Russian jurisdiction over plaintiffs' claims.[72]

---

[69]     *See* 10/20/11 Declaration of Mikhail Kuzmich Yukov, Russian lawyer and partner at the law firm of Yukov, Khrenov & Partners ("Yukov Decl.").

[70]     *See* 9/20/11 Declaration of William E. Butler, Russian lawyer and distinguished professor of law at the Dickinson School of Law, Pennsylvania State University.

[71]     11/1/11 Supplemental Declaration of William E. Butler ¶ 3.

[72]     *See* Shabalkina Decl. ¶ 7; Temkin Decl. ¶ 14; Lewin Decl. ¶ 18; Georgiou Decl. ¶ 9.

### 2. Retaliation

Plaintiffs claim that Lobanov learned of defendants' illegal schemes in 2009 and tried to protect Ambriz's investments by requesting the immediate sale of all equities held by defendants on Ambriz's behalf.[73]  UC allegedly then fired Lobanov in retaliation for his request.[74]  Lobanov argues that this termination was unlawful because he was not an employee at will, and that under his employment contract he could only be terminated for gross professional misconduct.[75]  Plaintiffs thus filed this action seeking monetary damages for defendants' securities fraud, corrupt practices, breach of contract and unjust enrichment arising out of the alleged trading improprieties and unlawful termination.

### 3. Service of Process

In order to serve defendants, plaintiffs hand delivered separate copies of the summons and Complaint addressed to each defendant to the offices of Auerbach at 25 West 45th Street in New York on July 7, 2011.[76]  At that time, the

---

[73]     *See* Compl. ¶ 28.

[74]     *See id.* ¶ 29.

[75]     *See id.* ¶ 26.

[76]     *See* Pl. Mem. at 5.

14

receptionist refused to accept service.[77]  Plaintiffs again attempted to serve

defendants at the same location on July 13.[78]  At that point, the receptionist

accepted the summonses on behalf of all defendants except for Malbourne, because

she had not heard of it.[79]  However, two days later, counsel for Auerbach contacted

plaintiffs' counsel to inform them that defendants did not have any offices within

Auerbach's offices and that Auerbach was not authorized to accept service on

behalf of defendants.[80]  Plaintiffs also arranged for two copies of the summons and

Complaint to be served on USL through the New York Secretary of State because

plaintiffs believed that USL had previously been registered to do business in New

York.[81]  Defendants explain that the reason for this inactive entry with the New

York Secretary of State is that UFC had contemplated opening a New York office

---

[77]     *See id.*; *see also* 7/11/11 Process Server Report, Ex. C to Kessler Decl. ("Auerbach Grayson & Co. will not accept for Malbourne Invest, S.A. (they say they do not know Malbourne Invest) or Uralsib Cap., LLC, Securities or Financial.").

[78]     *See* Pl. Mem. at 5.

[79]     *See id.*; *see also* Kessler Decl. ¶¶ 9-10; 7/18/11 Affidavit of Service, Ex. B to Kessler Decl.

[80]     *See* 7/15/11 Letter from Simkin, Auerbach's counsel, rejecting service of process, Ex. 4 to Lewin Decl.

[81]     *See* Kessler Decl. ¶ 11; *see also* 10/17/11 NYS Department of State Division of Corporations Entity Information for URALSIB Securities, Inc., Ex. E to Kessler Decl. (noting that entity status has been "inactive" since December 12, 2005); 7/18/11 Affidavit of Service, Ex. E to Kessler Decl.

15

in 2002, but decided against doing so for strategic business reasons.[82]  Hence the entity listed in the New York state database does not exist.[83]

Finally, plaintiffs attempted to serve Malbourne through what they believed to be Malbourne's "registered agent," the Trident Trust Company ("Trident").[84]  Plaintiffs learned that Malbourne was registered in Anguilla "at Trident," and that Trident maintained an office at 545 Fifth Avenue, Suite 402, in New York.[85]  Plaintiffs thus hand delivered a copy of the summons and Complaint to the receptionist at that location.[86]  Defendants all strongly assert that they have not been served, no service upon them has been attempted, and that they maintain no authorized agent to accept service in the United States.[87]  Moreover, to the extent that any advertisements or marketing materials appear to link defendants to

---

[82]     *See* Lewin Supp. Decl. ¶¶ 3-4.  Defendants thus clarify that the URALSIB Securities listed in the New York database was a different entity than USL.  *See id.* ¶ 4.

[83]     *See id.*

[84]     Kessler Decl. ¶ 12.

[85]     *Id.*

[86]     *See id.*; *see also* 8/30/11 Affidavit of Service, Ex. F to Kessler Decl.

[87]     *See* Shabalkina Decl. ¶ 6; Temkin Decl. ¶ 8; Lewin Decl. ¶ 13; Georgiou Decl. ¶ 6.

New York addresses or telephone numbers,[88] defendants claim that such references are exclusively to Auerbach and never to UFC, UC, USL or Malbourne.[89]

## III.   APPLICABLE LAW

Federal Rule of Civil Procedure 4 governs service of process.[90]  A plaintiff may serve a corporate defendant residing outside of the United States by (1) "any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents [the 'Hague Convention'];"[91] (2) any other "method that is reasonably calculated to give notice" and permitted by the foreign country (other than by hand delivery);[92] or (3) any means ordered by the court that is "not prohibited by international agreement."[93]  Under Federal Rule of Civil Procedure 12(b)(5), a party may assert the defense of "insufficient service of process."  The mandatary 120-day time limit for service of process, however,

---

[88]      *See* LinkedIn Web Pages, Exs. 5 and 6 to Pl. Mem.

[89]      *See* Lewin Supp. Decl. ¶ 5.

[90]      *See* Fed. R. Civ. P. 4(a)-(m); *see also Kurzberg v. Ashcroft*, 619 F.3d 176, 183 (2d Cir. 2010).

[91]      Fed. R. Civ. P. 4(f)(1), 4(h)(2).

[92]      *Id.* 4(f)(2).

[93]      *Id.* 4(f)(3).

does not apply to service of foreign defendants.[94]  Because there is no mandatory
120-day time limit to serve foreign defendants, "courts have used a flexible due
diligence standard in determining whether service of process under Rule 4(f) is
timely."[95]

   "[S]ervice on a defendant in a foreign country that is a signatory to the
Hague Convention [must] be attempted according to the terms of the Hague
Convention."[96]  However, "[w]here service on a domestic agent [of a foreign
entity] is valid and complete under both state law and the Due Process Clause . . .
the Convention has no further implications."[97]  Under the Hague Convention,
"process is first sent to the Central Authority of the foreign jurisdiction in which
process is to be served."[98]  The Hague Convention also provides additional ways to

---

[94]    *See id.* 4(m).

[95]    *Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05 Civ. 4880, 2007
WL 4326793, at *2 (E.D.N.Y. Dec. 7, 2007) (quotation marks omitted) (collecting
cases).

[96]    *S.E.C. v. Shehyn*, No. 04 Civ. 2003, 2008 WL 6150322, at *2
(S.D.N.Y. Nov. 26, 2008) (citing *Volkswagenwerk Aktiengesellschaft v. Schlunk*,
486 U.S. 694, 698-99 (1988); *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 299-300
(2d Cir. 2005)).  *Accord RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512, 2007
WL 1515068, at *1 (S.D.N.Y. May 24, 2007)*.

[97]    *Volkswagenwerk Aktiengesellschaft*, 486 U.S. at 707.

[98]    *Burda Media, Inc.*, 417 F.3d at 300.

18

effectuate service of process.[99]  "However, if a Central Authority is dilatory or refuses to cooperate, a plaintiff may request a U.S. court to order alternative service methods pursuant to Rule 4(f)(3), so long as the plaintiff waits at least six months from her initial application to the foreign Central Authority."[100]  Courts may require plaintiffs to demonstrate a good-faith effort to effectuate service on a foreign defendant before authorizing an alternative method of service.[101]

Although Russia is a signatory to the Hague Convention, in "July 2003, Russia unilaterally suspended all judicial cooperation with the United States in civil and commercial matters."[102]  Accordingly, courts have granted parties'

---

[99]     *See Arista Records LLC v. Media Servs. LLC*, No. 06 Civ. 15319, 2008 WL 563470, at *1 n.1 (S.D.N.Y. Feb. 25, 2008) (including service by mail and service upon judicial officers).

[100]     *Shehyn*, 2008 WL 6150322, at *3.

[101]     *See Prediction Co. LLC v. Rajgarhia*, No. 09 Civ. 7459, 2010 WL 1050307, at *1 (S.D.N.Y. Mar. 22, 2010) ("A district court may require the parties to show that they have reasonably attempted to effectuate service on the defendant(s) and that the circumstances are such that the district court's intervention is necessary.") (quotation marks omitted); *see also Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nig.*, 265 F.R.D. 106, 116 (S.D.N.Y. 2010) (holding that a court can reject a plaintiff's request for court ordered method of service under Rule 4(f)(3) where plaintiff failed to show a good faith effort to serve).

[102]     U.S. Department of State, Russia Judicial Assistance ("Russia Judicial Assistance"), http://travel.state.gov/law/judicial/judicial_3831.html.  *Accord Kuklachev v. Gelfman*, No. 08 Civ. 2214, 2008 WL 5068860, at *2 n.1 (E.D.N.Y. Nov. 24, 2008); *Arista Records LLC*, 2008 WL 563470, at *1; *RSM Prod. Corp.*,

19

requests to pursue alternative methods of service on Russian defendants pursuant to Rule 4(f)(3).[103]

## IV.    DISCUSSION

Plaintiffs have not attempted to effectuate service in Russia.  Nor have plaintiffs pled that they had — or would have had — trouble doing so.[104]  Plaintiffs have also not asked this court to allow them to serve defendants in any specialized manner under Rule 4(f)(3) due to difficulty with service under the Hague Convention or traditional methods.  Instead, plaintiffs submit that they have already effectuated service of process on defendants by serving defendants through Auerbach, the New York Secretary of State and Trident.  Moreover, plaintiffs believe that the case should not be dismissed for failure to effectuate service inasmuch as they "served Defendants in good faith because [counsel for plaintiffs] did so in reliance on both the Petition and the Memorandum of Law and its

---

2007 WL 1515068, at *1.

[103]    *See, e.g.*, *RSM Prod. Corp.*, 2007 WL 1515068, at *2.  The State Department has advised "litigants that they may wish to seek guidance from legal counsel in the Russian Federation regarding alternative methods of service" where appropriate.  Russia Judicial Assistance.

[104]    In fact, there is no question that both plaintiffs' and defendants' primary places of business are in Moscow, Russia.

exhibits submitted earlier this year."[105]  Under the flexible due diligence standard applied in this district, however, plaintiffs have thus far failed to effectuate service of process.

### A.    Plaintiffs' Service on Other Parties Was Ineffectual

Plaintiffs' service on entities other than defendants cannot constitute proper service.  *First*, service on Auerbach was not sufficient to effectuate service of process.  Auerbach is simply an affiliated broker-dealer and none of the defendants maintain a presence in the offices of Auerbach.[106]  Auerbach was also not a subsidiary or an agent of the defendants.  Moreover, plaintiffs were informed immediately by Auerbach that it could not accept service on behalf of defendants.[107]  Furthermore, plaintiffs cannot rely on the Petition and Memorandum of Law submitted in support of their earlier action to confirm an arbitration award that state that defendants can be served at 25 West 45th Street.  In fact, plaintiffs themselves authored those documents and defendants never contested the content of those documents because that case was voluntarily

---

[105]    Pl. Mem. at 4-5.

[106]    *See* Lewin Decl. ¶¶ 11-12.  Plaintiffs have cited no case suggesting that service in such a manner is sufficient under Rule 4.

[107]    *See* 7/15/11 Letter from Simkin rejecting service of process.

21

dismissed within six days.[108]  Finally, the two vague LinkedIn pages that plaintiffs submit with their Memorandum of Law are far too conclusory to establish that defendants actually maintain a presence in the offices of Auerbach.[109]  These very short listings merely represent two individuals' postings that they work for URALSIB in New York.  Defendants have explained, however, that (1) one of the individuals on LinkedIn previously worked for Auerbach covering the Russian markets, but no longer works there; and (2) the other individual formerly worked for a subsidiary of UFC in Omsk, Russia — a company with no presence at all in New York.[110]

            *Second*, plaintiffs' service on the New York Secretary of State cannot demonstrate good faith inasmuch as (1) the posting for URALSIB Securities in New York was clearly expired and has been terminated since December 12, 2005.[111]  In any event, plaintiffs do not controvert defendants' explanation that this

---

[108]    *See* 3/14/11 Notice of Voluntary Dismissal (No. 11 Civ. 1567, Dkt. No. 6).

[109]    *See* LinkedIn Web Pages, Exs. 5 and 6 to Pl. Mem.

[110]    *See* Lewin Supp. Decl. ¶ 6.  Likewise, the fact that UC appears to hold an annual investor conference in New York, *see* 10/18/11 News Release, Ex. 7 to Pl. Mem., does not give plaintiffs the ability to serve UC via other parties in New York.

[111]    *See* 10/17/11 NYS Department of State Division of Corporations Entity Information for URALSIB Securities, Inc.

listing was for a potential UFC subsidiary that was never actually formed.[112]  *Third*,

plaintiffs have failed to proffer any indication that Trident is related to Malbourne

in any way, and Malbourne has affirmed that no corporation or person in the

United States is authorized to accept service of process on its behalf.[113]  Plaintiffs'

various attempts to effectuate service via other parties cannot substitute for service

on defendants.

### B.    Good Faith Alone Does Not Excuse Failure to Serve

Finally, there is no reason for me to excuse plaintiffs' failure to

effectuate proper service.  Plaintiffs should have made some attempt at actually

serving defendants and, if that was ineffective, asked this Court to allow an

alternative means of service.  Moreover, all of the parties were clearly in

communication with experienced Russian counsel from whom plaintiffs could

have sought advice related to service.[114]  In the absence of any actual service, all

that plaintiffs proffer to this Court in support of their good-faith effort to serve

defendants are affidavits of service stating that certain unnamed receptionists —

---

[112]    *See* Lewin Supp. Decl. ¶¶ 3-4.

[113]    *See* Georgiou Decl. ¶ 6.

[114]    *See* Yukov Decl.

not even employed by defendants — took plaintiffs' summons and Complaint.[115]

However, I do not find that this meets even the low threshold required to

demonstrate a good-faith effort to effectuate service, and, in any event, plaintiffs

have not shown that I can or should waive the need for service based on good-faith

alone.

Moreover, as I informed the parties at an initial case management

conference, absent further facts, this case would merit dismissal for lack of

personal jurisdiction due to defendants' lack of sufficient contacts with New

York,[116] and under the doctrine of forum non conveniens due to the excessively

burdensome nature of litigating this case in New York.[117]  Additionally, to the

extent that plaintiffs have voluntarily withdrawn their breach of contract claims,[118]

Lobanov, the individual plaintiff, lacks standing to continue as a plaintiff in this

action inasmuch as his claims are based solely on breach of contract arising out of

---

[115]     *See* Exs. B, C, E, and F to Kessler Decl.

[116]     *See* N.Y. C.P.L.R. § 301.

[117]     *See Iragorry v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001).  It is
undisputed that all the parties and evidence in this case are outside the United
States, and that much, if not most, of the documentation is in Russian.  It is also
well established that what would constitute RICO claims here can be pursued
adequately in Russian courts.  *See, e.g.*, *Base Metal Trading SA v. Russian
Aluminum*, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003).

[118]     *See* Pl. Mem. at 2 n.4.

24

his termination and he had no stake in the alleged securities fraud.[119]   Accordingly,

plaintiffs are strongly advised to pursue their claims of fraud and breach of contract

in Russia — the forum most suitable for the resolution of this serious dispute.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted.

The Clerk of the Court is directed to close this motion [Docket No. 10] and this

case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              November 21, 2011

---

[119]     *See Monsanto Co. v. Geertson Seed Farms*, — U.S. —, 130 S. Ct.
2743, 2752 (2010) ("Standing under Article III of the Constitution requires that an
injury be concrete, particularized, and actual or imminent; fairly traceable to the
challenged action; and redressable by a favorable ruling.").

**- Appearances -**

**For Plaintiffs:**

Tedd E. Kessler, Esq.
Rheem Bell & Mermelstein, LLP
302 Fifth Avenue, 8th floor
New York, NY 10001
(212) 293-4001

**For Defendants:**

Richard T. Marooney, Jr., Esq.
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2242